# Isbell & Co. *v.* Lewis & Co.

*Action on Negotiable Promissory Note, against Endorser.*

1. *Notice of protest in towns of less than ten thousand population.*—The statute of Alabama (Code, § 1777) has no application to places of less

than ten thousand inhabitants, where the general law merchant obtains as to notice of protest, which requires notice of dishonor to endorser, when living in same place with holder, to be personal.

2. *Notice to endorser; how given.*—If the endorser of a protested note or bill have a place of business, notice of protest may be left there with any person found in charge of the place, whether such person be the agent of the endorser or not; and if he have a residence in the town notice may be left there with any person found on the premises, belonging there, and with capacity to transmit the notice.

3. *Absence of family as affecting fact of residence.*—The fact that *the family* of a party, to whom notice of protest is sought to be given, is temporarily absent, while the party himself had *his* residence there, and lived in it, would afford no ground of inference for a jury that his residence was not there. And though he might himself be *temporarily* absent, it would still remain his residence for all purposes of service of notices of dishonor required by the law merchant.

4. *Proof of custom of other banks than where note was payable not permissible.*—Proof of a custom prevailing with other banks in the town, than the bank at which the protested paper was payable, would not avail to show the custom at the latter bank.

5. *Waiver of want of notice and subsequent promise to pay.*—Where the endorser, or other party entitled to notice, has been discharged by failure of legal notice of protest, to waive such defense by subsequent promise to pay, the promise must be unconditional, or if conditional, it must be accepted on the conditions stipulated.

APPEAL from Talladega Circuit Court.
Tried before the Hon. LeRoy F. Box.

The facts fully appear in the opinion of the court.

BISHOP & WHITSON, for appellants.—1. The court, in its oral charge, assumed that McElderry had a place of business in Talladega, while the record shows that there was evidence tending to show that he had none; that he merely made the office of the Talladega Mercantile Company his "headquarters." Under that phase of the evidence the notice of protest sent through the mail was sufficient.—Morse on Banks, vol. 1, § 233; 1 Peters, 578; 1 Brick. Dig., p. 264, § 182; 3 Ran. Com. Pap., § 1276. 2. The place of business of the endorser is the place "in which the holder is entitled to look for the person for whom the notice is intended, or for some person authorized by him to receive it."—*Williams v. Bank of U. S.*, 2 Pet. 101; Bayley on Bills, 224. 3. The usage or custom of a bank to deposit notice in the post-office instead of serving the same personally, though the party lives in the same place, is binding upon the endorser and a party dealing with the bank.—Morse on Banks, vol. 1, § 233-9, and note; *Gindrat v. Merchants Bank*, 7 Ala. 333; 2 Am. & Eng. Enc. of Law, 107, and note; 2 Daniel Neg. Ins., § 1013. 4. Where a note is made payable at a bank, the endorser of a note is bound by a notice conformable to the established usage of

[Isbell & Co. v. Lewis & Co.]

that bank, whether he has personal knowledge of such usage or not.—*Chicopee Bank v. Eager*, 9 Metcalf, 583; *Mills v. Bank of U. S.*, 11 Wheaton, 431. The usage should apply to a place rather than a particular bank.—*Adams v. Otterback*, 15 Howard, 539; *Renner v. Bank of Columbia*, 9 Wheaton, 581. 5. As to promise of McElderry to pay, after failure to get due notice of protest.—*Bolling & Son v. McKenzie*, 89 Ala. 470; 2 Daniel Neg. Ins., § 1147; *Thornton v. Wynn*, 12 Wheaton, 184; *Kennon v. McRea*, 7 Port. 175.

H. L. McELDERRY and CECIL BROWNE, for appellee. 1. Where the holder and endorser of a bill reside in the same town, to fix the liability of the endorser the notice must be personal.—*Johns v. City Nat. Bank*, 57 Ala. 98; 3 Ran. Com. Paper, 351. The burden of proof rests on the holder to show notice, or an excuse for not giving it.—*Johns v. City Nat. Bank, supra;* 3 Ran. Com. Pap. 360. It is not sufficient to give notice to the brother of the endorser who said he would give it to him.—3 Ran. Com. Paper, 278. 2. The court did not err in refusing to allow evidence of the general custom of the banks of Talladega, and in confining the evidence on custom to the bank of Isbell & Co., 57 Ala. 98. 3. The court did not err in charges given on the question of subsequent promises to pay by the endorsers. *Crawford v. Childress*, 1 Ala. 489; *Oswego Bank v. Knowes*, Hill & Denio, 122; *May v. Coffin*, 4 Mass. 341. 4. Before an endorser is bound by a subsequent promise to pay, after his discharge by want of notice of protest, he must have knowledge that the several steps of demand, protest and notice have not been duly taken, and such promise must have been after dishonor and before suit brought.—*Bolling & Son v. McKenzie*, 89 Ala. 474; 10 Cush. 159; 17 Pick. 332.

McCLELLAN, J.—This is an action by Isbell & Co. against D. L. Lewis and George T. McElderry, composing the partnership of D. L. Lewis & Co., on a promissory note executed by D. W. Rodgers & Co. to said Lewis & Co., and by the latter endorsed to plaintiffs before maturity for value. Isbell & Co. is a partnership engaged in the business of banking in the city of Talladega. At the time of the maturity and dishonor of the note that place was the domicile—permanent residence—of McElderry, but Lewis, who also resided there when the note was made and endorsed, had removed to Birmingham. The note was executed in Talladega and payable at plaintiff's bank. It was protested for non-payment at maturity. The pleas and replications were

[Isbell & Co. v. Lewis & Co.]

in short by consent, as follows: "Defendants plead pay-
ment; failure to give notice [of dishonor], and all other
special matters of defense." Plaintiffs joined issue as to
payment, and for the rest replied: "1st. That there was a
good and sufficient excuse for a failure to give personal no-
tice of the dishonor of the note.   2d. That it was the custom
and usage of the bank and banking house of Isbell & Co.,
and of the banks of Talladega, to give notice of dishonor of
notes and bills and notice of protest through the mails where
both maker and endorser resided in Talladega.   3d. That
defendants, with knowledge of the want of notice, acknowl-
edged and recognized their liability on the note subsequent
to the 12th day of May, 1891 [when the paper went to pro-
test], and also that defendants subsequently promised to
pay the same." By agreement both plaintiffs and defend-
ants had leave "to introduce all special matters of defense
and in replication as though pleaded in full." There were,
however, no matters of defense or replication involved on
the trial beyond those indicated above.   Of these we shall
first consider the defense of want of notice and the suffi-
ciency of the excuse offered by plaintiffs for their failure
in that regard, assuming for the moment that they did so
fail.   Talladega, the evidence shows, has less than ten
thousand inhabitants, and it does not appear that it has a
free mail delivery.   Hence the questions we are now to
consider are to be determined on the law merchant and
without reference to our statute.—Code, § 1777.   By that
law, it is confessed, personal notice of dishonor must
be given to an endorser when the holder and endorser
live in the same town; notice by mail will not suffice.
Here personal notice was not given and the notice which was
mailed to McElderry did not reach him, if it can be said it
reached him at all, until three or four days after the last day
for his notification.   Two reasons are advanced for the pre-
termission of the requisite personal notice.   The first is that
upon diligent effort and inquiry he could not be found in the
city, and it was impracticable to give him notice.   It is
manifest when this excuse is considered with reference to
the evidence that it is rested on the theory that the requisite
notice must be given to the party sought to be charged in
person; that is, that the notification must pass directly and
presently from the holder or his agent to the endorser or his
agent.   This is not the law.   If the endorser have a place
of business, the notice may be left there with any person
found in charge of the place, whether such person be the
agent of the endorser or not, and if he has a residence in the

town the notice may be left with any person found on the premises and belonging there in any capacity, and apparently capable of transmitting the notice in the form in which it is given to the person for whom it is intended.—1 Brick. Dig. p. 262, §§ 150, 151–2, 154, 156 ; *Rives v. Parmley*, 18 Ala. 256 ; *Stanley v. Bank of Mobile*, 23 Ala. 652; 3 Rand. Com. Paper, §§ 1248, 1273, 1296, and authorities there cited ; 2 Dan. Neg. Inst. § 1017, and authorities. And it has been held by this court that notice intended for an attorney who was absent from his place of business and had no clerk, might be efficaciously served by leaving the original, or a copy in his office.—*Stanley v. Bank of Mobile*, 23 Ala. 652.

Therefore, if the office of the Talladega Mercantile Company was the place of business of George T. McElderry, the law required Boynton, the agent of the bank, to leave a notice of dishonor with J. B. Little, who was in charge of the place, and this, though, in point of fact, Little was not the agent of McElderry at all. If, on the other hand, the office of the Mercantile Company was not McElderry's place of business, then it was Boynton's duty to leave the notice at McElderry's residence, if he had a residence in the city of Talladega. And if he had such residence on May 12, 1891, it is wholly immaterial to inquire whether he also had a place of business at the office of the Mercantile Company or not, since upon any conclusion as to that the bank failed of its duty, either in respect of service at that place or in respect of service at the residence, it being entirely uncontroverted that no service was made any where. We are of the opinion that the evidence, without any conflict or adverse inference which the law regards as at all material, establishes that McElderry did have a residence in Talladega at the time in question. This evidence was that McElderry's permanent residence was in the town, and its location was perfectly well known to Boynton, who lived in the same neighborhood and passed the house daily in going to and from his own place of business, and that McElderry himself then occupied the house and resided there. To this extent there was no controversy whatever, either in testimony which was allowed to go to the jury, or in any that was offered by plaintiffs and excluded. There was a conflict upon a point beyond this, namely, whether prior to May 12, McElderry's *family* "had moved temporarily to the country." The bill of exceptions sets forth that there was evidence tending to show such removal of his family, and it also appears that the court declined to allow plaintiffs to prove that on the day named their agent, Boynton, had been informed

"that said McElderry's family were out of town and in the country." And, to the contrary, McElderry himself testified that he had a residence in Talladega at the time, known to Boynton, and that his family were at his said residence "during the month of May, 1891, and on the 12th of May, 1891, and that he resided there during such month, and that his family did not remove to the country until the early part of June, 1891." This presented an immaterial conflict. We may concede the truth in this connection to be in line with the tendencies of plaintiffs' testimony, that defendant's family had removed temporarily to the country prior to May 12th, 1891, and this is the utmost that plaintiffs contend for, without at all conceding that defendant's residence for all the purposes of notice was not still in the city of Talladega. Indeed, the fullest proof of such temporary removal of defendant's family taken with the undisputed evidence that he himself still resided in the town—had a residence there and lived in it—would afford no ground for an inference on the part of the jury that his residence was not in the city. It may well have been, as is not infrequently the case, that McElderry had sent his family away temporarily—for the summer months even—and yet continued to keep up and personally occupy his house in town as a residence, and if this were not true in this instance, it was on the plaintiffs, especially in view of defendant's own testimony, to prove that it was not so. But our conclusion on this part of the case need not be rested on these considerations. The authorities sustain us in the further position that where one has a permanent residence and *temporarily* removes from it, himself and family, it is yet after such removal and pending such temporary absence and residence elsewhere, his residence for all the purposes of service there of notices of dishonor required by the law merchant.—2 Am. & Eng. Ency. of Law, p. 415, and note ; 3 Rand. Com. Paper, §§ 1283-4-5. And, therefore, conceding, that McElderry and his family had taken up their temporary residence without the limits of the city of Talladega, it was still the duty of the plaintiffs to leave a notice for him at his town residence, or to show other facts which justified them in omitting to do so. It might, probably would, be a good excuse that the house was closed and there was no person on the premises to whom notice could be given or with whom it could be left. But no such showing is made in this case. Indeed no showing at all in this connection is even attempted. No agent of the bank made any inquiries at the house, or attempted to do so, or went to the house, or even near the house for the purpose of

giving notice to McElderry. All that appears in this con-
nection is that Boynton in casually passing by the house,
and within about one hundred and fifty feet of it, going to
or returning from his own home, at six o'clock in the after-
noon of May 12th, having at the time no purpose, so far as
the evidence discloses, of making inquiry for McElderry, or
of serving notice on him, or upon anybody at the residence
for him, "looked at the house and saw no lights appearing
in the doors or windows of the house, and saw no one there,
but did not stop or leave any notice at such residence." It
was scarcely to be expected that Boynton would have seen
lights in the house at six o'clock in the afternoon of May
12th, even though McElderry and all his family and servants
had been within. The fact that a casual and purposeless
glance at the building did not disclose the presence of per-
sons on the inside of it, certainly was no evidence that there
were not persons within. For all that this evidence shows
or tends to show, it may be that McElderry and his entire
household were in the residence at that moment of time.
Most manifestly this evidence utterly fails to show the dili-
gence which the law required of Boynton in respect of leav-
ing a notice at McElderry's residence, if indeed he had any
desire or intention so to do, which is not made to appear.
He should, at least, have made some effort to ascertain
whether there was any person there with whom the notice
could be left, with a view to its service on McElderry. The
excuse is wholly insufficient, on the aspects of the evidence
most favorable to the plaintiffs, for Boynton's failure to leave
a notice at McElderry's residence ; and so far as the absence
of notice is sought to be justified on the ground that the ex-
ercise of that diligence which the law required to give no-
tice to McElderry was abortive because of the impractica-
bility of finding him or any person with whom notice for him
could be left is concerned, the general affirmative charge
might well have been given for the defendants.

The custom pleaded as justifying and authorizing notice
of dishonor to be given by the bank to McElderry through
the mail was not proved nor would any testimony offered
and excluded by the court have legitimately tended to prove
it. The evidence, all of which was given by plaintiffs' wit-
nesses, in this connection not only had no tendency to prove
the custom relied on as existing at the time of the dishonor
of the note in suit, but to the contrary, was direct and posi-
tive to the point that while the custom pleaded had obtained
in the business of this bank up to January 1st, 1891, since
that time and covering the time when notice should have

been, given the defendants, an entirely different custom had prevailed in this respect, and that since the first of the year 1891 the usage of the bank had been to give the personal notice required by law, and which confessedly was not given in this case.   Proof that the other banks in Talladega continued the practice which had formerly obtained in this bank of giving such notices where the parties resided in the city only by mail would neither have availed the plaintiffs abstractly speaking, since the custom did not prevail with them, nor have supported their replication upon which issue, it is to be assumed, was joined, since the custom therein set up was a general one alleged to obtain in all the banks of Talladega; and hence the plaintiffs could not possibly have been injured by the exclusion of testimony tending to prove the alleged usage in other banks.

As to the replication that defendants with knowledge of plaintiffs' laches acknowledged and recognized their liability on the note and promised to pay the same, the evidence supposed to sustain this position is that of R. L. Ivey, a partner in and the cashier of Isbell & Co., as follows:  "A few days after the note sued on was protested (some three or four days) said Geo. T. McElderry and D. W. Rodgers (one of the firm of D. W. Rodgers & Co. the makers of the note) called to see him at the bank (Isbell & Co's).   That when they came in McElderry said to him (Ivey) 'I have brought Mr. Rodgers in to see if he can not make an arrangement to pay that note' (the note sued on).   That McElderry stated that if he, Ivey, would allow certain money which had been paid into the bank by or for D. W. Rodgers & Co. to the extent of one-half the note, to be placed as a credit on the note, he, McElderry, would individually endorse D. W. Rodgers & Co's. note at 30 or 60 days for the balance.   Said D. W. Rodgers offered to give such note at 30 or 60 days in renewal of one-half the note sued on, this proposition the witness declined.   That said McElderry then stated that he allowed the note to go to protest so as to bind D. L. Lewis, that it was not his desire to avoid liability on it himself but that if D. L. Lewis got a chance he would 'get out' and leave all the liability on him.   Said McElderry also proposed to witness to pay one-half the amount of such note if plaintiffs would release him individually from further liability on the note.   This the witness acting for plaintiffs refused to do.   This evidence of Ivey taken in connection with the uncontroverted testimony of McElderry himself to the effect that on the occasion referred to by Ivey and again about that time in a conversation with Isbell, another member of the

firm of Isbell & Co., he stated that he, witness, "did not desire to shirk or avoid any liability either legal or moral, but his, McElderry's, attorney had advised him that neither he nor D. L. Lewis was liable on the note and he disclaimed liability on it," fully presented the case made under the replication we are considering. Taking all of it which is supposed to be favorable to the plaintiffs, whether controverted or not, as true and all of it which is favorable to the defendants as true, because not controverted, it fails to show, or to afford any ground for a jury to conclude inferentially, that McElderry either promised to pay the note or any part of it or acknowledged and recognized his liability in whole or to any less extent upon it. It is elementary law that to amount to a waiver of the defense of want of notice in such case and to entitle the holder to recover notwithstanding the requisite notice has not been given, the promise to pay must be unequivocal and unconditional, or if conditional it must be accepted on the conditions and in the terms which it involves. And so with an admission or acknowledgment of continued liability; it must appear that the admission or acknowledgment was without equivocation and unclogged by reservations. As was said by Judge Story: "The promise must be unequivocal, and amount to an admission of the right of the holder; or the act done must be of a nature clearly importing a like admission of the right. If it be defective in either respect, or if it be a conditional offer of payment unaccepted, then, and in such a case, the holder has no right to insist upon it as a waiver. So if the promise be qualified, it must be received with its qualification, and can not be insisted upon as an absolute waiver."—Story on Bills, § 321. To the same effect is the text of Daniel on Negotiable Instruments: "If the promise is conditional, the acceptance of it must be proved in order to make it binding. And where it appeared that the indorser offered to give his own note, which was not accepted, it was held no waiver. [*Sice v. Cunningham*, 1 Cow. 397; *Agan v. McManus*, 11 Johns. 180]. So an offer to pay part cash and give his note for the balance, [*Barkalow v. Johnson*, 1 How. 397]; or to procure a renewal, [*Laparte v. Landy*, 17 Mort. (La.) 359]; or to pay in depreciated bank bills, [*Newberry v. Trowbridge*, 13 Mich. 637], or in Confederate currency, [*Tordy v. Boyd*, 26 Gratt. 637]." Daniel Neg. Inst. § 1163. See also 3 Rand. Com. Paper, §§ 1374 *et seq.*; *Kennon v. McRea*, 7 Port. 175. Here the defendant, McElderry, for himself and his co-defendant expressly disclaimed any liability on the note. While he said he had no desire to avoid liability either legal or moral, he at the same

time gave the plaintiffs to understand that he had been advised by his attorney that he was under no legal liability whatever, and asserted that he was not. It is manifest, and must have been so to plaintiffs, that McElderry did not want or intend to pay the note unless he was legally or morally bound to do so. He was not legally bound and he knew it, and relied *pro tanto* so to speak upon his absolution from all liability that could be enforced in the courts. It is equally manifest that he considered he was under a moral obligation to pay one-half the note, that Lewis should pay the other half upon like obligation, and that every thing he said and every proposition he made had reference to this moral liability. He nowhere admitted that in point of legal fact he owed the debt or any part of it, but always asserted to the contrary. Moved by his considerations of morality he did offer to give or endorse a note for one-half of the note and, we may concede for the purposes of this discussion, he also offered to pay one-half of it. But both propositions were expressly conditional; the first upon the bank's entering a credit on the note to the sum of the other half, and the other upon the bank's releasing him from all further liability on the paper having in view, it is fair to assume, the avoidance of a necessity to make the defense he was advised and asserted he had in the courts. And both these propositions were expressly declined. Guided by authority and reason we can not hesitate to declare that the waiver of notice by promise to pay or admission of liability set up in the replication finds no lodgment in the evidence or any inference which the jury could properly draw from the evidence. Our conclusion therefore is that the court was authorized to instruct the jury upon the hypothesis of their belief of the evidence. (1) that the notice of dishonor required by law was not given to the defendants, (2) that no custom of the bank justifying its pretermission was shown, and (3) that defendants had not waived the failure to give notice by any subsequent promise to pay, or acknowledgment of their liability on the note; or, in short, that the defendants were entitled on this question of notice alone to the general affirmative charge with hypothesis. The *status* of the case on the evidence justifying this charge would not be altered by the admission of all plaintiff's testimony which was excluded on defendant's motion or the exclusion of all defendant's evidence which was admitted over the objection of plaintiffs, and it is therefore immaterial to inquire whether there was error in any of these rulings of the court or in its action on

[Penn & Montgomery v. Smith, et al.]

special instructions requested. Whether erroneous or not these rulings could not have prejudiced the plaintiffs.

The judgment is affirmed.